FILED

2010 May-07  AM 11:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ROGER SHULER and CAROL SHULER,** | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action Number |
| v. | ) | **2:08-cv-1238-AKK** |
| | ) | |
| **INGRAM & ASSOCIATES and NCO FINANCIAL SYSTEMS, INC.;** | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Before the court is Defendant Ingram & Associates' ("Ingram") Motion for Summary Judgment.  Doc. 58.[1]  Plaintiffs Roger and Carol Shuler ("plaintiffs," or, sometimes referred to by their individual names) have responded, (doc. 61), and Ingram has replied, (doc. 67).  Accordingly, this matter is ripe for determination. Ingram's motion is GRANTED, for the reasons outlined below.

## I.  PROCEDURAL HISTORY

Plaintiffs commenced this action on July 12, 2008, (doc. 1), and filed an

---

[1] Reference to a document number, ("Doc. ___"), refers to the number assigned to each document as it is filed in the court's record.

amended complaint on November 3, 2009, (doc. 53), alleging that Ingram (1)

violated the Fair Debt Collection Practices Act ("FDCPA"); (2) made fraudulent

misrepresentations; (3) unlawfully invaded their privacy; (4) recklessly and

wantonly failed to train or supervise its employees; and (5) defamed them.  Doc.

53.

## II.  FACTUAL BACKGROUND[2]

On February 28, 2007, American Express placed a $10,537.30 debt in Roger

Shuler's ("Shuler") name with defendant NCO Financial Systems, Inc. ("NCO")

for collection.  Doc. 49 at 4.  NCO attempted to collect the debt until July 5, 2007,

when it forwarded it to Ingram for collection.  *Id.* at 5.

The parties agree to the following facts related to Ingram's collection

attempts:

1. Ingram mailed an initial demand to Roger Shuler on July 9, 2007, named the creditor, American Express, instructed Shuler to dispute the debt or any part of it in writing within 30 days, and included the required disclaimer, *i.e.*, that it was a debt collector attempting to collect the alleged debt;

---

[2] Consistent with its obligation under Rule 56 of the Federal Rules of Civil Procedure, this court is construing the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  Thus, plaintiffs' evidence, to the extent not contradicted by the established record, is taken as true and all justifiable inferences are drawn in plaintiffs' favor.  *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1136 (11th Cir. 2007); *Sparks v. Phillips & Cohen Assoc., LTD*, 641 F. Supp. 2d 1234, 1237 n.1 (S.D. Ala. 2008).

2.      Ingram attempted or had the following telephone contact with plaintiffs:

   a.      July 9, 2007 – Ingram phone attempt – mailbox full at Shuler residence;

   b.      July 9, 2007 – Ingram phone attempt – left voicemail message for Roger Shuler at work;

   c.      July 11, 2007 – Carol Shuler called Ingram and spoke with Tracy Mize.[3]  The conversation lasted approximately an hour;

   d.      July 12, 2007 – Ingram had conversations with Roger Shuler;

      i)      When an Ingram employee contacted Shuler at work, after a short conversation (less than five minutes), Shuler informed her that he could not talk at work and promised to call her back;

      ii)     That evening, Shuler called and spoke to Tracy Mize. During their conversation, he admitted that he owed the debt, discussed plans to obtain a second mortgage or equity line on his home, explained that he was in debt because he and his wife were victims of a crime perpetrated by lawyers and judges,[4] contended that Ingram had a professional obligation to report these lawyers and judges to the Alabama Bar Association, and threatened to report the Ingram firm to the state bar for an ethical violation if it failed to do so.  Shuler added that it was "well known in the Birmingham legal community that judges in Shelby County, [Alabama] are corrupt, and they are." Doc. 59 ¶ 23.  Shuler claims that

---

[3] Tracy Mize was a legal assistant employed by Ingram.

[4]  Plaintiffs claim they lost a legal dispute with their neighbor because of fraudulent conduct by their lawyer and the judge assigned to their case.  This alleged fraudulent conduct by third parties is what Shuler claimed Ingram had an ethical obligation to report to the Alabama State Bar.

Mize became "testy" with him, and said she would not tell Angie Ingram, the named partner of the firm, about his complaint regarding his lawyer and Shelby County judges.  Shuler recorded this conversation and also provided a transcript of it;

iii)   Shuler called Ingram back and spoke to Jann Blalock.[5] During their two conversations, which he also recorded, Shuler complained again about the judges in Shelby County, claimed he was a victim of a crime in his unrelated case, and insisted again that Ingram had an obligation to report this alleged criminal conduct to the state bar;

e.   July 25, 2007 – Ingram phone attempt – mailbox full at Shuler residence;

f.   July 25, 2007 – Ingram phone attempt – left voicemail message for Roger Shuler at work;

g.   July 27, 2007 – Letter from Roger Shuler to Ingram stating that any "financial problems" he has are the result of crimes committed against him by "members of the Alabama judiciary and the Alabama State Bar" and, again, he claimed Ingram had an obligation to report his lawyer and the judge in his unrelated case to the state bar; and

h.   July 27, 2007 – Letter from Roger Shuler to Ingram disputing the debt, requesting the name of the executive and legal counsel at American Express who authorized Ingram to pursue litigation on the account, and demanding that Ingram only contact him in writing.  This was the first time Shuler asked Ingram in writing not to call him at home or at work.

Doc. 59 at 5-9; doc. 61 at 3-4.

---

[5] Jann Blalock is an employee of Ingram & Associates.

Plaintiffs allege further the following additional facts, which this court accepts as true:

1.  On July 11, 2007, Carol Shuler verbally instructed Ingram not to call Roger Shuler at work, and the next day, Roger Shuler provided the same instruction;[6]

2.  Ingram attempted to contact Roger Shuler at work on July 25, 2007;

3.  On July 12, 2007, during two telephone conversations, Ingram, through Jann Blalock, violated the FDCPA by (a) being "testy," "abusive," and "smart-alecky," toward Roger Shuler and stated that he was "conducting a witch hunt or a scam, or was a scam artist;"[7] (b)

---

[6] There is no recording of Carol Shuler's call with Ingram, so there is no evidence to support the allegation regarding July 11, 2007. The court accepts this fact as true nonetheless. However, the court notes that since Carol Shuler was not the debtor, and she does not allege that Ingram sought to collect the debt from her, technically, she had no standing to stop Ingram from calling her husband to collect the debt he owed. As to July 12, 2007, plaintiffs cite to audio recordings 2 and 3, included as Exhibit 4 to Ingram's Motion for Summary Judgment, to support their assertion that Roger Shuler told Ingram to stop calling him. The court listened to the audiotapes and read the transcripts plaintiffs furnished of these conversations. They do, in fact, show that Roger Shuler told Jann Blalock on July 12, 2007, not to call him at home or at work any more. Doc. 71-2 at 2. However, after giving this instruction, Shuler rescinded it by calling Blalock back almost immediately, (*see* doc. 71-2 at 4-6 and 71-3), and mentioning that he told Tracy Mize earlier that day that he and his wife were exploring their options to refinance their mortgage. *See* doc. 71-3 at 4. He suggested to Mize earlier that he would use the proceeds to settle his debt. Doc. 71-1 at 8, 10. As a result, Mize promised to give him a week to try to obtain the refinancing and asked if she could talk to him again on July 20, 2007. *Id.* at 16. Shuler said, "well, yeah." *Id.* In other words, Shuler essentially nullified the instruction he gave to Blalock in their first conversation when he called her back and referenced the conversation he had with Mize.

[7] Since Roger Shuler recorded his telephone calls with Ingram, the court was able to ascertain the "tone" of the conversations at issue. Although the court disagrees with plaintiffs' characterizations, the conversations became heated indeed. However, the contention was unrelated to the collection of the debt at issue. Rather, the discussions became contentious when Roger Shuler insisted that the Ingram law firm had an obligation to report lawyers and judges he believed committed a fraud against him in a prior lawsuit. *See* docs 71-1 at 15-18, 71-2 at 1-6, and 71-3 at 1-5. Interestingly, Tracy Mize, Ingram's employee, spent significant portions of her conversation telling Shuler how to contact the Alabama State Bar and gave him the name of white collar criminal lawyers who

refusing to inform Shuler who specifically at American Express hired Ingram and by representing that American Express hired them when in fact, Ingram is part of the "NCO Attorney Network;" and (c) representing to Shuler that "we prosecute," and "we take it to court," "it is always ruled in our favor," "there's not much of any way around that."

4.      Ingram, through Tracy Mize, further violated the FDCPA by telling Shuler that, (a) "if we go forward, there will be a lien on your property and we will garnish your wages, 25% of disposable income;" and (b) that Ingram would not be involved in Shuler's "witch hunt" against lawyers and judges and asked if Shuler had tried this "scam" with other people.  Mize also violated the FDCPA because she "was not respectful;"[8] and

5.      On July 11, 2007, Ingram violated the law by speaking with Carol Shuler for almost an hour, even though, by Ingram's own description, she was "shaky," "absolutely hysterical," and "in a panic."

Doc. 61 at 5-10.

---

specialize in fraud matters.  Doc. 71-1 at 10-15.  Moreover, when Shuler informed her that he maintains a blog and posted his issues with lawyers and judges on it, Mize even told him to watch the content he posted to avoid a "slander" claim.  *Id.* at 13.  These are hardly the actions of individuals who are "testy," "abusive," or "smart-alecky."  In any event, Shuler was not interested in filing his own bar complaint and insisted to Mize and Blalock instead that Ingram had an ethical obligation to report the alleged misconduct.  *See* docs. 71-1, 71-2, and 71-3.  When Mize and Blalock disagreed and told him an obligation existed only if they witnessed the misconduct first hand, the conversation became contentious with Shuler taking the lead.  However, as the audiotapes show, Mize and Blalock did not use the alleged tone in an effort to collect a debt.  Rather, they responded simply in kind to the badgering Shuler directed at them over a matter that, as they told him repeatedly, was unrelated to the debt he owed to American Express.

[8] As stated in note 7, *supra*, Mize's comments about a "witch-hunt" and a "scam" were unrelated to the debt collection.  Rather, they were in response to Roger Shuler's insistence that Mize and her employer had an obligation to report to the Alabama State Bar alleged misconduct by Shuler's lawyer and a state court judge in an unrelated matter.

### III.  SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323.  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324 (internal citations and quotations omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must construe the evidence in the light most favorable to the nonmoving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

# IV.  LEGAL ANALYSIS

As shown below, plaintiffs fail to meet their burden of establishing that

Ingram violated their rights under the FDCPA and Alabama law.  Accordingly,

Ingram is entitled to judgment as a matter of law on all claims.

## A.    Plaintiffs' FDCPA claims fail because Ingram complied fully with section 1692.

The FDCPA prohibits certain specific conduct.  As it relates to this matter,

plaintiffs contend Ingram violated subsections 1692g, d(2) and (5), e, e(4) and (5),

and f.  The court disagrees.

### i.    *Ingram provided the validation notice required by section 1692g.*

Section 1692g requires that the collector send a written notice to the debtor

containing specific information within five days of the collector's contact.  On

July 9, 2007, the same day it first attempted contact with Shuler, Ingram mailed a

document to Roger Shuler entitled "Instructions for Making Payment or Disputing

the Debt,"  (doc. 60-3 at 1), which complied fully with § 1692g.  Summary

judgment is therefore warranted.  Alternatively, "summary judgment is appropriate

since [plaintiffs] failed to respond to [defendant's] argument on this issue."

*Brewer v. Purvis*, 816 F. Supp. 1560, 1579 (M.D. Ga. 1993), *aff'd* 44 F.3d 1008

(11th Cir. 1995); *see also* doc. 61.

> ii.    *Ingram did not use abusive language in violation of section 1692d(2).*

Section 1692d(2) forbids debt collectors from "engaging in any conduct the natural consequence of which is to harass, oppress or abuse" any person, including "the use of obscene or profane language or language the natural consequence of which is to abuse the hearer or reader."  This subsection "was meant to deter offensive language which is at least akin to profanity or obscenity . . . [which] might encompass name-calling, racial or ethnic slurs, and other derogatory remarks which are similar in their offensiveness to obscene or profane remarks." *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1178 (11th Cir. 1985).  Significantly, a debt collector informing a consumer that legal proceedings could cause her "embarrassment, inconvenience, and further expense is a true statement . . . does not create a tone of intimidation," and "such consequences of a debt collection . . . lawsuit are so commonplace that even a consumer susceptible to harassment, oppression, or abuse would not have been harassed, oppressed, or abused by the statement in and of itself."  *Id.* at 1179 (citations and quotations omitted); *see also Wright v. Credit Bureau of Ga., Inc.*, 555 F. Supp. 1005, 1007 (N.D. Ga. 1983) (holding that a general threat that debtor's failure to pay his bills would adversely affect his credit rating is not a violation of the FDCPA).

Courts have construed narrowly the type of conduct that violates §

1692d(2).  For example, in *Thomas v. LDG Fin. Servs., Inc.*, the debt collector

allegedly yelled at the consumer, said that "they were going to get their money one

way or the other," and that "Georgia was a garnishable state," and then hung up

the telephone.  463 F. Supp. 2d 1370, 1372 (N.D. Ga. 2006).  Later, the collector

said to the consumer, "you make the same salary when you were paying the bills,

so what's the problem now?"  *Id.*  When the consumer complained, another

employee advised her that the first collector "is like that to everyone; she scares

people into paying."  *Id.*  The court held that these statements did not rise to the

level of obscene or profane language described in *Jeter* and dismissed plaintiff's §

1692d(2) claim.  *Id.* at 1373.

This court has reviewed the statements and conduct plaintiffs challenge,

listened to the two audiotapes, and read the transcripts (including the third

conversation plaintiffs allegedly only disclosed in response to Ingram's summary

judgment motion), and finds no violation of 1692d(2).  Taken directly from the

transcripts plaintiffs provided, Ingram's employees made the following statements

to them:

- "I will be happy to work with you in any way I can if we need to
  establish some payment arrangments . . . but you need to understand
  if we go forward, there will be a lien on your property and we will

garnish your wages, 25% of your disposable income."  Doc. 71-1 at 16.

- In response to Roger Shuler's insistence that Angie Ingram report lawyers and judges who defrauded him, Tracy Mize stated "she has an obligation if she has first-hand knowledge [of the alleged misconduct].  Sir, I'm ending the conversation . . . .  You can't go any further.  Ms. Ingram is not going to be involved in your, uh, witch hunt, okay?  You do what you need to do."  *Id.* at 18.

- Ingram told Carol Shuler on July 11, 2007, that "your house is going to be auctioned off on the courthouse steps."  Doc. 71-3 at 2. When Roger Shuler questioned Ingram about this statement on July 12, 2007, Jann Blalock told him "[w]e didn't say the house.  We said the deed to your house and that's what happens with any judgment . . . . We're not hired really to make settlements, we're hired to just sue. So we go ahead, and we, you know, we prosecute – we take it to court.  It's always ruled in our favor because the debt's due, you know, I mean, there's not much of anywhere [sic] around that.  Now, once the judgment, once anybody gets a judgment, then you attach assets whether that be [voice overlap].  Your wife is not on this note. So let's say you work and your wife words [sic], we couldn't garnish her wages, but we can yours if you're [sic] name is on the bank account, we can take the money that you put in your bank account. And as far as salary is concern [sic], we get a 25% of what's referred to as disposable income, which is after taxes until the debt is settled.[9] If, as far as the deed on the courthouse door steps, what happens on that is that, there's already by this point, I mean we go to court and there's a judgment and that judgment is what any title agency or title company looks for [voice overlap]."  Doc. 71-3 at 2-3.

The court finds that, as in *Jeter*, *Wright*, and *Thomas*, Ingram's employees only described to plaintiffs the likely consequences of their failure to pay the

---

[9] This statement is consistent with Ala. Code § 5-19-15.

alleged debt and engaged in no abusive conduct.  Indeed, the statements merely

outlined the types of problems a consumer faces if the creditor files a lawsuit to

collect on the debt, and as such, comply with § 1692d(2).  *Jeter*, 760 F. 2d at

1179.[10]  Moreover, the tape recordings and corresponding transcripts Roger Shuler

made demonstrate clearly that Ingram's employees never used obscene, profane,

or abusive language (rather, plaintiff Roger Shuler used obscene language (*see*

doc. 71-2 at 3)), and while plaintiffs allege that Ingram's employees were "testy,"

"abusive," and "smart-alecky," this was in connection to Roger Shuler's insistence

that they help him take on lawyers and judges in an unrelated matter.  While it is

probably unpleasant to hear about the garnishment of wages or the placement of a

lien on one's residence, these are remedies available to creditors.  As such, there is

no violation of § 1692d(2).  *See Thomas*, 463 F. Supp. 2d at 1372; *Wright*, 555 F.

Supp. at 1007.

---

[10] The *Jeter* court also states, as plaintiffs observe, that in addition to the "least sophisticated consumer" standard applied to FDCPA claims, in analyzing a § 1692d claim, a court should also consider the debtor's individual susceptibilities to harassment, *i.e.*, poverty, probation, or being "at the mercy of a power relationship."  760 F.2d at 1179.  Plaintiffs note that Roger Shuler has a heightened sensitivity with respect to the judicial system because of his alleged previous mistreatment by the judicial system.  Doc. 61 at 18.  In other words, plaintiffs contend that because Roger Shuler lost a lawsuit he felt he should have won, any mention to him about utilizing the legal process to collect a debt automatically triggers a violation of § 1692d.  *Jeter* does not support plaintiffs' position.  Consideration of the plaintiff's individual sensitivity did not impact the *Jeter* court's holding.  Indeed, the *Jeter* court specifically stated that certain "consequences of a debt collection . . . lawsuit are so commonplace" that they do not harass, abuse, or oppress even a sensitive plaintiff.  760 F.2d at 1179.  Shuler's sensitivity does not alter this court's finding that a description to him of the possible consequences of a lawsuit does not violate § 1692d(2).

   *iii. Ingram did not repeatedly telephone plaintiffs in violation of section 1692d(5).*

  Section 1692d(5) prohibits debt collectors from "causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with the intent to annoy, abuse, or harass anyone at the <u>called number</u>." (emphasis added). In other words, the FDCPA prohibits creditors from initiating phone calls to annoy, abuse, or harass debtors or their housemates.

  Plaintiffs' claim is premised on the number of calls Ingram made and their contention that Ingram violated § 1692d(5) when Ingram called Roger Shuler after plaintiffs told Ingram on July 11 and 12, 2007, not to call him again. First, as to the calls after July 12, 2007, while it is true that Ingram employees called Shuler twice on July 25, 2007, as stated *supra* in note 6, Shuler called Jann Blalock back immediately after he instructed her not to call him again. Docs. 71-2 at 2-6 and 71-3. Significantly, when he called back, he referenced an earlier conversation that day with Tracy Mize, in which he agreed that Mize could call him a week or so later to allow he and his wife time to try to refinance their mortgage – the proceeds of which he suggested he would use to satisfy his debt to American Express. Doc. 71-1 at 10, 16. Under these facts, Ingram had a reasonable basis to call Shuler after July 12, 2007.

Moreover, plaintiffs do not contend that Ingram left an abusive, annoying, or harassing message on July 25, 2007.  To the contrary, the record shows only that Ingram tried to call Roger Shuler at home and, because of a full voice mailbox, left him a message on his personal voicemail at work.  Plaintiffs contend instead that Ingram violated § 1692d(5) simply by placing the call.  However, a short message asking Shuler to return a call is not the type of conduct that violates § 1692d(5)'s prohibition against debt collectors "causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with the intent to annoy, abuse, or harass anyone at the called number."  15 U.S.C. § 1692d(5).

As to the number of calls, the undisputed facts show that Ingram initiated telephone contact with Roger Shuler on five occasions over a 17-day period, never called repeatedly at the same location, and only made contact with plaintiffs once (and for less than five minutes) on a call Ingram initiated. The court finds that, collectively, these five telephone call attempts do not violate § 1692d(5), as they were not abusive, annoying, or harassing.[11]  *Compare Udell v. Kan. Counselors,*

---

[11] The court's holding is the same even if the court includes in its analysis the three calls plaintiffs made to Ingram.  Again, to the extent that these calls became annoying, abusive, or harassing,  it was unrelated to Ingram's debt collection efforts.  Rather, it was due primarily to Roger Shuler's insistence that Ingram had an ethical obligation to get involved in his contention that his lawyer and judge in an unrelated matter committed a crime against him. *See* note 7, *supra.*

*Inc.*, 313 F. Supp. 2d 1135, 1143 (D. Kan. 2004) (four automated calls over seven days without leaving a message did not, as a matter of law, constitute harassment under the FDCPA); *Kuhn v. Account Control Tech., Inc.*, 865 F. Supp. 1443, 1453 (D. Nev. 1994) (holding that calling a consumer at her place of employment back two times in a five-minute period after she had hung up on the collector constituted harassment).

iv.     *Ingram did not violate section 1692e by stating that it represented American Express.*

Plaintiffs allege that Ingram violated § 1692e, which prohibits "false, deceptive, or misleading" representations, by stating that it represented American Express, rather than NCO, who forwarded the debt to Ingram.  However, it is undisputed that American Express retained NCO to collect a debt the Shulers owed, and that NCO referred the debt to Ingram & Associates, a member of its Attorney Network, for collection.  Indeed, plaintiffs admitted these facts in their opposition brief.  Specifically, plaintiffs admitted that Ingram's undisputed facts 1-13 are correct.  Doc. 61 at 3.  These facts state that Roger Shuler fell behind on his American Express bill, which he testified "was in the realm of six to ten thousand dollars," that he had not paid his debt, that American Express placed the debt with NCO for collection, and, in undisputed fact number 9, that "Ingram was

retained as legal counsel for American Express." Doc. 59 at 4-5. Plaintiffs' own admission that American Express retained Ingram belies their contention that Ingram made a false, deceptive, or misleading representation when it stated it represented American Express. Therefore, Ingram is entitled to summary judgment on the § 1692e claim.

> v. *Informing a debtor of possible legal actions the debt collector can take is not a misrepresentation or a threat in violation of sections 1692e(4) and (5).*

Section 1692e(4) prohibits "the representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action." Similarly, § 1692e(5) prohibits "the threat to take any action that cannot legally be taken or that is not intended to be taken." In other words, to prevail, a plaintiff needs to show an idle threat or a threat to take an unlawful action.

Courts are clear that "merely advising the debtor of the agency's options with which to pursue the debt is the sort of truism that is legally insufficient to violate § 1692e." *Sparks v. Phillips & Cohen Assoc., LTD.*, 641 F. Supp. 2d 1234, 1249 (S.D. Ala. 2008). In *Sparks*, the plaintiff alleged that the debt collector's

statement that it could force her to sell her deceased mother's house in probate to pay her mother's debts constituted a deceptive threat under § 1692e(4). *Id.* The court disagreed and granted summary judgment, finding that the statement constituted neither a threat nor a false representation, but rather an "innocuous statement" of defendant's "legal rights." *Id.* The court also rejected plaintiff's contention that defendant's statement amounted to a threat to take action that it could not legally take, or that it did not intend to take, in violation of § 1692e(5). *Id.* The court held that no one could reasonably construe the statement as a threat, or a "threat that defendant never intended to pursue." *Id.* at 1250. Rather, the statement "placed [plaintiff] on notice of [defendant's] options," and because the creditor could legally seek to sell the debtor's home, it could not constitute a threat for purposes of § 1692e(5). *Id.* at 1250.

Like the defendant in *Sparks*, Ingram, as a debt collection law firm, is legally entitled to seek the seizure, garnishment, or attachment of the property or wages of Roger Shuler to collect on the American Express debt. The statements that Ingram may place a lien on plaintiffs' property, garnish Shuler's wages, that Ingram prosecutes debts like his, and always wins since the debt is owed,[12] (doc.

---

[12] Given Roger Shuler's testimony that he owed American Express "in the realm of six to ten thousand dollars," (doc. 60-1 at 42), it is hard to imagine how he would have prevailed in a collection lawsuit.

61 at 7-10), do not constitute threats or actions that Ingram could not or did not

intend to take.  Rather, the statements placed plaintiffs on notice of options legally

available to Ingram.  *See Sparks*, 641 F. Supp. 2d at 1249-50.  As such, they are

not prohibited by §§ 1692e(4) and (5).

Finally, plaintiffs miss the mark when they contend that Ingram's failure to

file a lawsuit establishes that it never intended to file a lawsuit and therefore

violated §§ 1692e(4) and (5).  There is no provision in § 1692e that states that

filing a lawsuit is the *only* way for a debt collector to establish that it actually

intended to file a lawsuit.  To the contrary, because Ingram is a law firm

specializing in collections, (*see* www.ingramlawofficesllc.com), a reasonable

likelihood existed that Ingram would indeed sue to collect the debt when it so

stated to plaintiffs.  That Ingram (or more likely, American Express) has not yet

elected, or may have decided not, to sue does not create a material dispute.

Ingram's actions here are not akin to those in *Jeter* in which the creditor

represented that it would sue in five days if the plaintiff failed to respond.  760

F.2d at 1175-76.  Moreover, unlike *Jeter*, plaintiffs here have not presented any

evidence showing that Ingram never sues debtors or sues only in extremely rare

situations – both of which factored in the *Jeter* court's decision.  *Id.* at 1176-77.

Plaintiffs' failure to present this type of evidence is not surprising since Ingram is,

after all, a collection law firm.  Since NCO transferred Shuler's account to Ingram

after it could not collect, a reasonable likelihood existed that Ingram indeed

intended to sue at the time it made the statements at issue.  Accordingly, summary

judgment is warranted on plaintiffs' §§ 1692e(4) and (5) claims.

> vi.    *Ingram's statements or actions were not "unfair" or*
> *"unconscionable" in violation of section 1692f.*

Plaintiffs allege a violation of § 1692f, which prohibits the use of "unfair or

unconscionable means" in collecting or attempting to collect a debt. Doc. 53 ¶ 24.

However, plaintiffs fail to specify in either their complaint or their briefs the

precise "unfair" or "unconscionable" conduct.  Because plaintiffs' allegation is

unaccompanied by any facts and also because of their failure to specifically

address this claim in their opposition brief, summary judgment is warranted.  *See*

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1965 (2009) (a complaint's factual allegations

must raise a right to relief above the speculative level); *Chapman v. AI Trans.*, 229

F.3d 1012, 1027 (11th Cir. 2000) ("Parties opposing summary judgment are

appropriately charged with the responsibility of marshaling and presenting their

evidence before summary judgment is granted, not afterwards.").  Alternatively,

summary judgment is also proper because, again, a debt collector's statements

regarding actions it can take legally, *i.e.*, the forced sale of the debtor's house or

garnishment of wages, do not constitute a threat or false representation, nor are they unfair or unconscionable for purposes of § 1692f.  *Sparks*, 641 F. Supp. 2d at 1250.[13]

> **B.    The fraud claim fails because Ingram made no misrepresentations, or alternatively, there is no detrimental reliance.**

Plaintiffs allege a fraud claim on the basis that Ingram falsely claimed it would sue plaintiffs, garnish Roger Shuler's wages, sell their house, and misrepresented that Ingram represented American Express when, in fact, "they were part of the NCO Attorney Network."[14]  Doc. 61 at 22.  To establish fraudulent misrepresentation, plaintiffs must show: "(1) a false representation, (2) concerning a material existing fact, (3) relied upon by the plaintiff, (4) who must be damaged as a proximate result."  *Cherokee Farms, Inc. v. Fireman's Fund Ins. Co., Inc.*, 526 So. 2d 871, 875 (Ala. 1988); *see also* Ala. Code § 6-5-101.  As discussed above, under the FDCPA, Ingram's statements to plaintiffs concerning possible action it is legally entitled to take or that it represented American Express are not misrepresentations.  That American Express and/or Ingram has not yet

---

[13] While the list of potential types of violation listed in § 1692f is not exhaustive, the court notes that the wrongs described by plaintiffs do not resemble any of those described in the statute.

[14] Again, plaintiffs accepted as an undisputed fact that American Express hired Ingram.  *See supra,* subsection IV, A, (iv).  Therefore, on this issue, their fraud claim fails.

elected to pursue these avenues does not mean they are not legally entitled, or that they do not intend, to file a claim. *See Sparks*, 641 F. Supp. 2d at 1250 (finding that defendant's statements to plaintiffs regarding the seizure and sale of their home merely placed them on notice of the debt collector's valid options).

Alternatively, the fraud claims fail because plaintiffs cannot demonstrate that they relied on the alleged misrepresentations to their detriment.  Speaking to a bankruptcy lawyer "two or three times," (doc. 61 at 22), does not amount to the "damage" required to show detrimental reliance under Alabama law. *See Bosarge Offshore, LLC v. Compass Bank*, 943 So. 2d 782, 786 (no detrimental reliance found on bank's alleged fraudulent letter of credit issued to plaintiff, even though letter caused plaintiff to begin his transition into a new business, show the letter to other people, and damage business relationships in the plaintiff's former business).

### C.     Ingram did not invade plaintiffs' privacy.

A claim for invasion of privacy in  the creditor/debtor relationship arises from "the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Black v. Aegis Consumer Funding Group, Inc.*, 2001 WL 228062, at *4 (S.D. Ala. Feb. 8, 2001) (citations omitted).  However, reasonable efforts to collect a debt do not rise to the level of a wrongful intrusion. *See Norris v. Moskin*

*Stores, Inc.*, 132 So. 2d 321, 323 (Ala. 1961). Instead, a creditor must take "actions which exceed the bounds of reasonableness" for a debtor to have a cognizable invasion of privacy claim. *Black*, 2001 WL 228062, at *5.

For example, in *Norris*, a female collector called a debtor's wife twice and suggested that she, the collector, was in an illicit relationship with the debtor husband. 132 So. 2d at 322. The collector also called the debtor's sister-in-law, and said that she, the collector, was "in trouble" and needed to know if the debtor was married. *Id.* The court found that these actions constituted a "vicious attempt to coerce payment" that rose to the level of "wrongful and actionable intrusion." *Id.* at 325.

Similarly, in *Black*, a debt collector called the debtor as early as 7:00 a.m. and as late as 11:30 p.m., threatened to take her children's clothing as part of the payment, threatened to file a lien against the debtor's parents' home, used profanity, and told the debtor's six-year-old son that "his mommy [would] be going to jail." 2001 WL 228062, at *2. The court found that this conduct constituted a "systematic campaign of harassment," that "falls beyond the realm of reasonable action and well into the area of wrongful and actionable intrusion." *Id.* at *7.

By contrast, in *Sparks*, the defendant debt collector conducted a telephone conversation with the 15-year-old plaintiff that left the plaintiff distraught, told another plaintiff that the defendant had "investigated" her, and accused the 15-year-old plaintiff of impersonating her mother on the telephone.  641 F. Supp. 2d at 1253.  The court held that "[s]uch slights may well have been impolite, ill-advised and inappropriate, but they plainly do not rise to the level of an intentional interference with any plaintiff's solitude and seclusion," and that as a matter of law, defendant's "actions were not so outrageous as to cause mental suffering, shame or humiliation to a person of ordinary sensibilities."  *Id.*

As in *Sparks*, Ingram's conduct does not rise to the level of harassment necessary to sustain an invasion of privacy claim.  While plaintiffs allege that Tracy Mize's conversation with Carol Shuler was "abusive and invasive" because it involved "attempts to coerce [her] into payment arrangements, [and] frightening her with respect to selling her house," (doc. 61 at 25), one conversation discussing payment methods and permissible  remedies upon execution of judgment does not "exceed the bounds of reasonableness," (*Black*, 2001 WL 228062, at *5), and does not rise to an invasion of privacy.  *See Norris*, 132 So. 2d at 323; *Sparks*, 641 F. Supp. 2d at 1253.

The other recordings fail also to establish an invasion of privacy claim.  In fact, the tape recordings establish that Roger Shuler was the one who became agitated and used profanity – not the Ingram representatives.  *See* docs. 71-1, 71-2, and 71-3.  Moreover, Mize's statement to Roger Shuler that he was "on a witch-hunt" was a reasonable response to his persistent demand that Ingram file a complaint against an unrelated attorney and judge with the Alabama State Bar.  *See* doc. 71-1.  As to the recordings of Jann Blalock, since Ingram is a law firm, hired to sue to collect a debt, Blalock's statements to Shuler that Ingram would obtain judgment because he owed the debt and her explanation of the remedies available to Ingram to collect on a judgment, (doc. 71-3 at 2-3), were not an impermissible mere idle threat or attempts to coerce payment.  *See Norris*, 132 So. 2d at 325.  Rather, Blalock simply relayed the obvious to Shuler – since he owed the debt (which he admitted to Mize (*see* doc. 71-1 at 2, 6, 10)), a court would, in fact, issue a judgment against him if he failed to pay.  There is nothing about Blalock's or Mize's statements that "exceed the bounds of reasonableness."  *See Black*, 2001 WL 228062, at *5.

The court finds that Ingram engaged in reasonable collection efforts (*see Norris*, 132 So. 2d at 323), and did not impermissibly intrude on plaintiffs'

solitude and seclusion (*see Sparks*, 641 F. Supp. 2d at 1253).  Accordingly, the

court grants Ingram's motion.

> **D.    The reckless and wanton training and supervision claim fails because Ingram did not engage in tortious conduct and/or had no knowledge of such.[15]**

To establish a claim for negligent, reckless or wanton supervision, a

plaintiff must show that "(1) the employee committed a tort recognized under

Alabama law, (2) the employer had actual notice of this conduct or would have

gained such notice if it exercised due and proper diligence, and (3) the employer

failed to respond to this notice adequately."  *Edwards v. Hyundai Motor Mfg.*

*Ala., LLC*, 603 F. Supp. 2d 1336, 1357 (M.D. Ala. 2009); *see also Voyager Ins.*

*Cos. v. Whitson*, 867 So. 2d 1065, 1070-71 (Ala. 2003) (demonstrating that for

both negligent and wanton supervision, a plaintiff must properly allege tortious

conduct).  However, to sufficiently allege a claim of reckless or wanton training or

supervision, rather than for negligence, plaintiffs must demonstrate that Ingram

had actual knowledge of an employee's tortious conduct – a higher bar than

negligence's "knew or should have known" standard.  *See Big B, Inc. v.*

---

[15] Plaintiffs' opposition brief argues a theory of negligent or wanton supervision and training, (doc. 61 at 20), which is not a claim they pled before this court. *See* doc. 53 at ¶¶ 33-36.  Because their current amended complaint alleges only a claim for reckless and wanton (rather than negligent) training and supervision, this court limits its analysis solely to this claim.  However, the court notes that, because plaintiffs have failed to allege an underlying tortious harm committed by Ingram's employees, summary judgment is warranted even on a negligent supervision and training theory.

*Cottingham*, 634 So. 2d 999, 1004 (Ala. 1993) (distinguishing reckless and wanton training and supervision from negligent training and supervision). Furthermore, wantonness requires actual knowledge by the employer that "injury is likely to result from his act or omission." *Id.*

To prevail, plaintiffs must establish that one of Ingram's employees tortiously harmed them, that Ingram had actual knowledge of that harm, and failed to address the situation. *See Edwards*, 603 F. Supp. 2d at 1357; *Big B*, 634 So. 2d at 1004. Plaintiffs cannot do so for two reasons. First, as discussed herein, plaintiffs have alleged no cognizable tort claim against Ingram. Therefore, their reckless and wanton training and supervision claim fails as a matter of law. Second, plaintiffs have provided no evidence that establishes Ingram had actual knowledge of wrongful conduct by its employees. At all times, plaintiffs spoke only to Tracy Mize, a legal assistant, and Jann Blalock, the office manager. *See* docs. 71-1, 71-2, 71-3. Accordingly, the reckless and wanton supervision and training claim fails as a matter of law.

### E.   The defamation claim fails because Ingram did not publish plaintiffs' debt to a credit bureau.

Plaintiffs allege that Ingram caused the publication of the alleged debt on Roger Shuler's credit report. *See* doc. 53 ¶ 37. However, in their opposition

brief, plaintiffs accepted Ingram's undisputed fact number 36 – *i.e.*, that Ingram did not report the debt to a credit bureau. Docs. 59 at 10; 61 at 4.  Moreover, plaintiffs did not address the defamation claim.  Therefore, plaintiffs have abandoned this claim.  Accordingly,  summary judgment is warranted.  *Chapman*, 229 F.3d at 1027 ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *see also Nelson v. Lapeyrouse Grain Corp*., 534 So. 2d 1085, 1091 (Ala. 1988) (defamation claim requires a plaintiff to show "that the defendant was at least negligent, in <u>publishing</u> a false and defamatory statement to another concerning the plaintiff.") (citations omitted) (emphasis added).

## IV.  CONCLUSION

For reasons stated above, plaintiffs' claims against Ingram fail as a matter of law, and Ingram's motion for summary judgment, (doc. 58), is GRANTED. Ingram's motions to strike, (docs. 66 and 73), are DENIED.

Done this 7th day of May, 2010.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE